CHARLES H. KENT and ELMER A. KENT, doing business under the firm name and style of C. H. KENT & SON, Respondents, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COM- PANY, Appellant.

Kansas City Court of Appeals, May 3, 1915.

1. CARRIERS OF LIVE STOCK:- Delay in Reaching an Intermediate Point. A shipper sued for damages alleged to have been caused by negligent delay in reaching G. an intermediate point by a certain time whereby the stock could get eleven hours for feed and rest instead of five hours required by the Federal Twenty-eight Hour Law. The stock did not reach there in time to enable the carrier to comply with said law, and the shipment reached its destination on time and for the market for which it was intended. There was no provision in the con-

tract that the stock should reach G. at any particular hour, nor that the cattle should have eleven hours rest. The contract provided that the stock· was to be transported in a reasonable time but not by any particular train. *Held*, that the carrier, having performed every legal duty devolving upon it by reason of the contract and growing out of the relation created thereby, was not liable.

2. ———: ———: Interstate Shipments. In an interstate shipment the liability of the carrier is to be determined in the light of Federal legislation and the construction placed thereon by the National courts. Such liability arises out of, and must be measured by, the shipping contract and the duties which the law imposes upon the carrier by virtue of the relation which the contract created.

3. ———: ———: ———: Feeding and Watering of Stock. Under the common law the carrier was free to exercise its own judgment as to when stock transported by it should be fed and watered, subject only to the requirement that this should be done at reasonable intervals and that the needs of the stock should not be unreasonably neglected. But the enactment of the Federal Twenty-eight Hour Law was a legislative direction that cattle could be kept on board cars without feed or water for twenty-eight hours. And when the carrier has performed all it agreed to do and all the law requires of it, there can be no liability when the liability claimed is not on account of some act or wrong independent of and aside from the contract.

Appeal from Gentry Circuit Court.—*Hon. Wm. C. Ellison,* Judge.

REVERSED.

. *H. J. Nelson, J. W. Peery* and *M. G. Roberts* for appellant.

*Frank J. McCaslin* and *James F. Wood* for respondents.

TRIMBLE, J.—This is a suit for damages by reason of alleged negligent delay occurring in the course of the transportation of five carloads of cattle over appellant's railway system from Worth, Missouri, to Chicago, Illinois. The town of Worth is on a branch road

which connects with the main line at Chariton, Iowa. When shipments originating on the branch reach Chariton they are picked up by trains on the main line and carried forward to Galesburg, Illinois, another division point, and from thence they are taken on to Chicago. At Galesburg appellant maintains stock pens equipped for feeding, watering, and resting cattle for five hours under the Federal Twenty-eight Hour Law.

The cattle were loaded at Worth and started on their journey at noon of Saturday, July 8, 1911, respondents intending that they should reach the Chicago market on the morning of Monday, July 10. The cattle reached there in ample time for, and were sold on, the market for which they were intended. There is no complaint on that score. The cattle were delivered to the consignee at point of destination in Chicago at 4:15 on the morning of July 10. This was admitted, and it was also admitted that the time consumed in the transportation and delivery of the cattle from Worth to Chicago was the uusal and ordinary time for that service, allowing and including five hours for feed, rest and water at Galesburg in compliance with the Federal law, which the cattle got at that point.

The theory and basis of respondents' complaint is that from their years of experience as shippers they knew that if the cattle were transported with reasonable care and diligence, they would reach Galesburg at from six to nine o'clock Sunday morning and would there, at that time of the day, receive feed and water and obtain *eleven* hours freedom from the cars and be thoroughly rested for their remaining journey to Chicago, thereby presenting a better appearance at said last-named point Monday morning, and, by reason of having gone without food or water from the morning before, they would be enabled to take on a better fill. Respondents say that having this idea in mind they shipped the cattle from Worth to Chicago expecting to get the benefit of an early feed and water on Sunday

morning and a subsequent rest of eleven hours prior to the sending forward of the cattle on to Chicago in time to reach there early Monday morning, but that owing to a delay arising between the division points of Chariton, Iowa, and Galesburg, Illinois, the cattle did not reach Galesburg until ten or eleven o'clock Sunday, and were not unloaded until 12:30 which was in the middle and heat of the day, and perhaps five and a half hours later than usual.

It is very difficult to gather from respondents' evidence just what they claim the damage arises from, whether from the fact that the cattle were fed and watered at Galesburg so much nearer the time of their watering at Chicago that they would not take on the proper fill before going on the market, or whether it is also claimed that the cattle shrank unduly by reason of being in the cars and on the road instead of resting quietly in the pens during this five and a half hours. Certain it is that the inability of the cattle to fill constitutes by far the greater portion of the damages claimed. Respondents themselves attended to watering the cattle at Galesburg and could have easily regulated the supply as it came from a hydrant under their control. So that if the inability to properly fill at Chicago arose from getting too much water at noon the day before at Galesburg, it would seem at first blush that respondents could have prevented that if they had seen fit to do so. But there is evidence that if a scanty or less measure of water had been given them, they would have suffered from the heat and fretted so much as to cause an equal or greater loss than if they were given all the water they got. There is also evidence that fat cattle standing and being jostled in the cars in hot weather shrink more than when quietly resting in the pens, and that as these cattle were in the cars for five hours when they would have been resting in the pens had there been no delay in reaching Galesburg, they shrank more than necessary and had a stale

appearance when placed upon the market. So that, giving to respondents' evidence its fullest effect, we cannot say the loss arose solely because the cattle got too much water at Galesburg and that respondents should be denied recovery upon the ground that they watered the cattle themselves and could have given them less.

This, however, is a minor objection to respondents' recovery. The question still remains whether appellant is liable for any delay in reaching Galesburg. There was no delay in going from Worth, Missouri, to Chariton, nor any in going from Galesburg to Chicago. The only delay claimed was in going from Chariton to Galesburg. The evidence as to delay is undoubtedly vague and somewhat confused. Respondents admit they had a good run to Chariton. In certain portions of their testimony they admit that the regular schedule and running time of trains between Chariton and Galesburg was twelve hours. And appellant's wheel reports show that the train in question left Chariton at 10:55 Saturday night and reached Galesburg at 10:15 Sunday morning, which was forty minutes inside the regular schedule of twelve hours. This point, however, was two miles from the unloading chutes to the resting pens, and the time occupied in getting cattle from this point to the chutes varied from thirty minutes to an hour and a half owing to the number of trains and cattle to be unloaded. Nine cars could be unloaded at a time at the chutes and the cars next to the caboose are unloaded last, and respondents' cattle occupied this position. There is no evidence of any negligent delay in getting the cattle to the chutes and unloaded after Galesburg was reached so that no time on that account can be counted. In other portions of their testimony, however, respondents say they had been accustomed to get out of Chariton about eight or nine o'clock Saturday night and get to Galesburg Sunday morning about six or seven o'clock, making the run

in about ten hours; that the train in question left Chariton between eight and nine Saturday night but did not get to Galesburg until about 10:30 Sunday morning and the cattle were not unloaded until 12:30. Their evidence further tended to prove that the train was too heavily loaded for the engine, thereby causing it to make slow time between the two points, that two hours were lost in ''doubling Albia Hill'' and that there was another delay of a half hour at Burlington, Iowa, but no other stops; and that by reason of all this they did not get their cattle into the resting pens until 12:30 instead of in the morning as they usually did.

According to appellant's time cards and official schedules, the regular train left Chariton at six o'clock Saturday night. Respondents cattle from Worth could not catch it because it is admitted they did not get to Chariton until after seven o'clock. The next regular train to go on from Chariton after six o'clock was one that left at 1:50 in the night. But appellant made up an extra train and started to Galesburg with these cattle before that, leaving, according to appellant's official records made at the time and in the course of duty, at 10:55, but according to respondents' testimony, somewhere between eight and nine o'clock. Of course, the time when Galesburg would be reached would depend upon the time of leaving Chariton; and the evidence is not as clear as it might be as to the circumstances under which a run could be made between the two points in ten hours, whether by extra special trains under the most favorable circumstances, or whether such was the usual and ordinary time in which the trip was made. But taking respondents' evidence all in all, there is enough therein from which the jury could infer and find that the trip was ordinarily made in ten hours; that usually cattle from Chariton reached Galesburg in time to be unloaded in the morning and there spend eleven hours in the resting pens before being sent forward on their journey to the market; and that there was a de-

lay of five hours in getting to Galesburg on this occasion caused by the heavy loading of the train. The case must, therefore, be determined upon the theory that there was delay, caused as respondents say it was, in getting the cattle to the resting pens in Galesburg whereby they got only the five hours of rest allowed by the Federal law instead of the eleven hours respondents anticipated they would get when they shipped.

It might seem that since there was evidence sufficient to support respondents' claim of delay, it was useless to set forth the nature and character of the evidence as we have done, but our purpose was to show that such failure to get the cattle into the resting pens as soon as respondents expected was not the result of any wrongful act on the part of appellant tending to injure the cattle, which would give the owners a cause of action independent of and aside from the shipping contract. As we view it, appellant's liability, if any, to respondents necessarily arises out of, and must be measured by, the contract between them, and the duties which the law imposes upon the carrier by virtue of the relation which that contract created.

First of all, the contract is one dealing with an interstate shipment. The liability of the carrier is, therefore, to be determined in the light of Federal legislation and the construction placed thereon by the National courts. By the Carmack Amendment to the Hepburn Act of June 29, 1906, Congress has legislated directly upon the carrier's liability for loss of and damage to interstate shipments and this and other Federal legislation on the subject of interstate commerce is supreme and exclusive, and supersedes all other regulations. [Adams Express Company v. Croninger, 226 U. S. 491; Missouri, etc., R. Co. v. Harriman, 227 U. S. 657.] By this legislation, the carrier is required to have a written shipping contract and cannot ship without one, and a uniform rule as to the liability of such carriers growing out of such contracts was established.

It is true, an interstate carrier is liable for a violation of its common-law duty as well after as before the enactment of that legislation. But under the common law the carrier was free to exercise its own judgment as to when stock being transported by it should be fed and watered, subject only to the requirement that this should be done at reasonable intervals and that the needs of the stock should not be unreasonably neglected.. But when Congress enacted the Federal Twenty-eight Hour Law, this was a legislative direction that an interstate carrier could keep cattle on board cars without feed or water for twenty-eight hours and, if requested by the shipper, they could be kept for twelve hours longer than that. If from the time the cattle were loaded at Worth until they were unloaded, fed, and watered at Galesburg, the cattle could be said to have been kept without feed or water an unreasonable length of time under the common law (and of this there is no evidence), nevertheless the Federal Act has superseded the common law in this regard and is exclusive. Appellant did not violate the Federal law in this case because the twenty-eight hours did not expire until four p. m. Sunday whereas they were unloaded at 12:30 p. m. nearly four hours before, and the cattle were given full five or five and a half hours for feed, rest and water as required by the law.

The contract governing the shipment in this case, and by which the duty, and consequently the liability, of the carrier must be measured, did not provide that the cattle should be in Galesburg at any particular time of day so they could be fed in the morning instead of in the afternoon, neither did it provide that the cattle should have eleven hours rest at that point instead of five. The contract expressly provided that the carrier did not agree to transport the cattle by any particular train; it merely agreed to transport the cattle from Worth to Chicago in a reasonable time. It is true there was a provision in the contract that the cattle

should be fed at Galesburg, but this was done within the time required by law, and the cattle were delivered at destination in Chicago within the time required by the contract and at the time and for the market desired by respondents when they shipped. Appellant has, therefore, performed every legal duty devolving upon it by reason of the contract and growing out of the relation created thereby. How then can appellant be held liable when it has done all it agreed to do and all that the law requires of it? The liability claimed is not on account of some act or wrong independent of and aside from the contract. Enabling the cattle to be fed and watered at any particular hour and giving them more time than the law provided for rest were matters which were legitimately within the scope and range of the things to be covered by the contract if the parties had desired to bring them into it by inserting a clause providing therefor. But this was not done. To enable respondents to obtain a recovery for something which might very reasonably and naturally have been brought within the scope of the contract, but which clearly was not within its terms nor contemplated by it, is to enable one party to a contract to recover from the other although there has been no violation of the terms thereof nor of any duty imposed by law on that other as a result of such contract. If respondents had on former occasions obtained the benefit of eleven hours rest for their cattle instead of five, it was not a contractual right but was at most only an advantageous or fortunate circumstance not enjoyed by other shippers in general, and not enforcible by any of them. The only way by which it could be made enforcible would be to insert it in the contract as one of the agreements thereof binding upon the contracting parties.

Under the circumstances we do not see wherein respondents have shown any violation of legal duty on the carrier's part on which a liability can be predicated. For this reason we are of the opinion that the

judgment should be reversed. It is so ordered. The other judges concur.